UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**LAQUITA JACKSON**,                                          Case No. 1:12 CV 2772
**for other S.T., a minor**,

             Plaintiff,                      Magistrate Judge James R. Knepp II

    v.                                                  MEMORANDUM OPINION AND
                                                            ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

             Defendant.

### INTRODUCTION

Plaintiff Laquita Jackson, on behalf of her minor child S.T., appeals the administrative

denial of supplemental security income (SSI) benefits under 42 U.S.C. § 1383. The district court

has jurisdiction over this case under 42 U.S.C. § 1383(c)(3). The parties have consented to the

exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule

73. (Doc. 13). For the reasons given below, the Court affirms the Commissioner's decision

denying benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed S.T.'s application for SSI on June 24, 2009, alleging a disability onset date

of May 15, 2003, S.T.'s date of birth. (Tr. 132-34). Her application was denied initially (Tr. 87-

89) and on reconsideration (Tr. 96-102). Plaintiff, represented by counsel, requested a hearing

before an Administrative Law Judge (ALJ). (Tr. 65-66, 76-82). Plaintiff, S.T., and Arthur

Newman, M.D., a medical expert (ME), testified at the hearing, after which the ALJ found S.T.

not disabled. (*See* Tr. 14-31, 35-64). The Appeals Council denied Plaintiff's request for review,

making the hearing decision the final decision of the Commissioner. (Tr. 1-3); 20 C.F.R. §§ 416.1455, 416.1481. On November 6, 2012, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

Born May 15, 2003, S.T. was six-years old and considered a preschooler on the date her SSI application was filed; however, she had reached the level of "school-age" by the time the ALJ made his decision on August 17, 2011. (Tr. 20). 20 C.F.R. §§ 416.926a(h)(2), (i)(2).

### Disability Reports

Plaintiff alleges S.T. has been disabled since birth due to Attention Deficit Hyperactivity Disorder (ADHD) and a behavior disorder. (Tr. 132, 136). In a disability report, Plaintiff reported S.T. was in second grade but not in special education classes. (Tr. 140). S.T. was taking Adderall for ADHD and Clonidine for sleep, and experienced no side effects. (Tr. 138, 158-59).

Plaintiff filled out a function report and indicated S.T.'s abilities to communicate and progress were limited. (Tr. 147). Specifically, S.T. could not deliver telephone messages, explain why she did something, talk to friends, read capital letters of the alphabet, read and understand stories in books, write in longhand, or tell time. (Tr. 147-48). S.T. was working on improving her reading and math skills. (Tr. 148). Plaintiff also reported S.T.'s impairments affected her behavior toward other people, including hitting or kicking people when she was upset. (Tr. 150). According to Plaintiff, S.T. could be friendly but would "fly off the handle" when asked to do work. (Tr. 151).

After S.T.'s claim was initially denied, Plaintiff reported S.T. had severe ADHD, anger issues, and temper tantrums. (Tr. 156). She also indicated S.T. would misbehave so she could "be by herself" and she had trouble completing tasks at school and at home. (Tr. 156). Plaintiff said S.T.'s grades improved when she was on medication. (Tr. 156).

Plaintiff continued to report aggressive behavior, mood changes, and difficulty concentrating, but indicated S.T. was "doing a little better" with new medication. (Tr. 165, 180).

**Academic Reports, School Evaluations, and Individualized Education Program (IEP)**

S.T.'s first grade report card showed she received mostly A's and some B's in her classes. (Tr. 185). Her second grade report card also revealed mostly A's and B's. (Tr. 184, 305). Academic testing revealed S.T. was "working above grade level in almost every area" and "[n]o specific educational needs [were] noted[.]" (Tr. 199).

On November 18, 2010, speech-language pathologist Camille George, CCC-SLP, assessed S.T.'s communication skills as part of an Evaluation Team Report (ETR). (Tr. 201). S.T. was "very cooperative and attentive throughout the evaluation." (Tr. 201). S.T.'s classroom teacher reported no concerns about her ability to understand lessons and directions or express what she knew. (Tr. 201). Ms. George found S.T.'s expressive and receptive language abilities "well within normal limits." (Tr. 201).

On December 17, 2010, school psychologist Mary Wilson, M.A.Ed., J.D., evaluated S.T. as part of the ETR and noted she had been diagnosed with ADHD. (Tr. 196). She noted S.T. demonstrated behavior "currently described by her teacher as periodic and infrequent." (Tr. 196). Ms. Wilson also noted S.T. had difficulty handling disruptions in daily routine but "respond[ed] appropriately to a flexible-yet-consistent schedule with her teacher and an opportunity to be helpful in the classroom." (Tr. 196). "Academically, her teacher report[ed] no concerns other than those directly related to her occasional behavior outbursts." (Tr. 196).

Dr. Wilson administered the Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV) and the Woodcock-Johnson III Tests of Achievement (WJ-III) in January 2011. (Tr. 197-98). WISC-IV testing revealed S.T. was functioning in the average to high-average range for

her chronological age. (Tr. 197). WJ-III testing revealed S.T. was performing above grade level in almost every area, consistent with her cognitive ability. (Tr. 199).

Dr. Wilson also conducted a behavioral observation and social-emotional assessment as part of the ETR. (Tr. 203-04). S.T.'s mother reported severe disruptive behavior at home, but her second-grade teacher did "not see[] a significant degree of ongoing behavioral problems[.]" (Tr. 204). However, her teacher did note S.T. was occasionally withdrawn, pessimistic, or sad but her occasional outbursts had lessened in intensity and frequency since the beginning of the school year. (Tr. 204). Dr. Wilson found S.T. would likely need support for transitions, a plan with coping techniques, and individualized reinforcement. (Tr. 204).

The ETR team determined S.T. was not an emotionally disturbed child under state law. (Tr. 205). While S.T. had difficulty maintaining friendships, she could build relationships at an age-appropriate level. (Tr. 205). Further, while S.T. exhibited inappropriate behavior at times, it was not to a "marked degree." (Tr. 205). They found her behavior problems infrequent, short-lasting, and not severe, and noted S.T. "[could] go weeks or months without a significant problem." (Tr. 205, 207). In addition, they found S.T. did not exhibit a "general or pervasive mood of unhappiness or depression[.]" (Tr. 205). They concluded S.T. had "a documented medical condition that [] periodically interfere[d] with her academic functioning despite above average ability and academic achievement" which "require[d] specially designed instruction to directly address." (Tr. 208).

On February 21, 2011, S.T.'s father met with school staff to discuss the ETR and implement an IEP. (Tr. 187-94). The team noted S.T. was performing at or above grade level in all academic areas which was consistent with her cognitive ability. (Tr. 188). Nevertheless, S.T. was sad and/or withdrawn at times, had occasional and unpredictable outbursts, and difficulty

4

handling routine changes. (Tr. 188). Her father mentioned he would like her to control her aggression. (Tr. 188).

The ETR team felt S.T. needed assistance but her behavior was not severe enough to warrant placement in a handicapped program. (Tr. 208). Thus, they developed an IEP that implemented a reward system for good behavior. For example, positive behavior would be rewarded with activity S.T. identified as relaxing and enjoyable, such as five minutes of computer time or performing tasks as a teacher's helper. (Tr. 190). Further, when S.T. became angry or frustrated, she would fill out a feelings chart and choose a coping strategy. (Tr. 190). As part of the plan, S.T. was also given extended time and frequent breaks during statewide testing. (Tr. 192).

**Counseling and Medication Management**

S.T. received early child mental health counseling at the Achievement Center for Children in 2006 and 2007. (Tr. 215-23). Treatment goals included helping S.T. control demanding behaviors and speak in a calm voice. (Tr. 221). Treatment notes indicated S.T. "sometimes" demonstrated a bossy and demanding tone at daycare, but it was not interfering with peer or teacher interactions. (Tr. 221). Plaintiff and S.T. stopped attending scheduled sessions, and attempts to contact Plaintiff via telephone and mail were unsuccessful. (Tr. 223). Thus, S.T. was discharged from treatment for failure to comply with treatment. (Tr. 223).

In April 2009, S.T.'s pediatrician referred her to Applewood Center (Applewood) for suspected ADHD and oppositional defiance disorder (ODD). (Tr. 225, 235). According to Plaintiff, S.T. got along with her peers "some days" but her school was concerned about aggression, inattention, and impulsive behavior. (Tr. 227-28). Plaintiff also reported S.T. was suspended twice for aggression, had poor focus, and received all D's in regular education

classes. (Tr. 228-29). At the initial evaluation, the therapist recommended testing and possibly medication. (Tr. 236).

In June 2009, clinical nurse specialist Toby Bourisseau interviewed S.T. for a psychiatric evaluation at Applewood. (Tr. 239-42). According to S.T.'s father, she had temper tantrums at home and school, stomped her feet, kicked, talked back, and tried to hit. (Tr. 239). She was also "a bully at school and daycare", had trouble paying attention, and was suspended for punching a peer. (Tr. 239). On examination, S.T. was pleasant, polite, and cooperative. (Tr. 241). She had clear, logical thought process; no tics; no psychomotor agitation/retardation; no delusions; intact attention span; average fund of knowledge; intact insight and judgment; and appropriate abstract reasoning for age. (Tr. 241). Nurse Bourisseau diagnosed ADHD and ODD, assessed a global assessment of functioning score (GAF) of 55[1], and recommended Adderall. (Tr. 241-42).

Plaintiff met with Nurse Bourisseau in July 2009 and indicated S.T. was sleeping better but her behavior was still the same, i.e., hyperactive and aggressive. (Tr. 246). Nurse Bourisseau increased S.T.'s Adderall dosage and prescribed Clonidine for sleep disturbance. (Tr. 246).

Accompanied by her parents, S.T. returned to Nurse Bourisseau in November 2009. (Tr. 260). Her parents reported S.T.'s medication wore off in the afternoon resulting in increased symptoms. (Tr. 260). S.T. was doing well in school, received all A's, and had been student of the week. (Tr. 260). She was sleeping and eating well, and took medication as prescribed with no reported side effects. (Tr. 260). S.T.'s examination was normal; she was pleasant, polite, and engaged easily; had a good mood and full range of affect; her thought process was clear; and she

---

1.The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning.  American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 55 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers)." *Id.* at 34.

demonstrated no psychomotor agitation/retardation. (Tr. 260). Nurse Bourisseau increased S.T.'s Adderall dosage. (Tr. 260). At a follow-up visit, S.T.'s parents reported her behavior had not changed, i.e., she was still hyperactive in the afternoons when her medication wore off. (Tr. 261). Nurse Bourisseau discontinued Adderall and prescribed Vyvanse, as S.T.'s parents reported her sister, also diagnosed with ADHD, was benefiting from Vyvanse as opposed to Adderall. (Tr. 261).

Throughout the beginning of 2010, Plaintiff generally reported S.T. was more focused and her behavior improved but her symptoms still increased in the afternoons at daycare and at home. (Tr. 262, 283-84, 293). S.T.'s mental status examinations were normal and Nurse Bourisseau continued to adjust S.T.'s medication dosage. (Tr. 262, 283-84, 293). By June 2010, S.T. show "some progress" with her medication regimen and Nurse Bourisseau kept her medication the same. (Tr. 294).

In October 2010, S.T. saw Donna Zajc, RNC, at Applewood for medication management. (Tr. 310). Plaintiff said S.T. fought with her sister at home sometimes but had no behavioral problems at school and received A's and B's. (Tr. 310). Her examination was normal and her medication regimen was continued. (Tr. 310).

S.T.'s status at follow-up appointments in December 2010 and January 2011 generally remained unchanged. (Tr. 308-09). In 2011, S.T. continued to do well academically but had occasional outbursts at school when other children called her names. (Tr. 306-07). On April 11, 2001, S.T.'s parents reported she had been acting out at school, including turning over a desk, flipping over a chair, and refusing to cooperate. (Tr. 306). They also indicated S.T. was small for her age and was taking Pediasure to help with growth. (Tr. 306-07). Her medication dosage was increased and continued. (Tr. 306-07).

**Consultive Psychological Evaluation**

On October 2, 2009, Joseph Konieczny, Ph.D., performed a psychological evaluation when S.T. was six-years old. (Tr. 248-50). S.T.'s parents reported she began taking medication for ADHD in June 2009 which alleviated her symptoms. (Tr. 249). However, when she was not on medication, she was hyperactive, restless, and unable to concentrate and pay attention. (Tr. 249). Dr. Konieczny noted S.T. was "somewhat subdued" but cooperative and responsive, and her ability to concentrate and attend to tasks revealed no indication of impairment. (Tr. 249).

Although she was only seen for an interview and not required to engage in long-term tasks, S.T. showed no symptoms of hyperactivity, restlessness, or inattentiveness. (Tr. 249). There was also no indication of mood swings, mood disturbance, or any diminished tolerance for frustration. (Tr. 249). S.T.'s social skills, emotional skills, and personal and behavioral patterns were at a three-quarter level of age appropriate functioning. (Tr. 250). However, her cognition, communication, motor skills, concentration, and persistence appeared to be age appropriate. (Tr. 250). Dr. Konieczny diagnosed ADHD, in partial remission and "some school difficulties", and assigned a symptom GAF score of 64[2], and a functional GAF score of 50[3] due to her reported problems at school. (Tr. 250).

**State Agency Physicians**

On October 8, 2009, state agency psychologist Bonnie Katz, Ph.D., completed a Childhood Disability Evaluation Form. (Tr. 253-54). Dr. Katz concluded S.T. had a "severe" impairment, but it did not meet or medically equal a listing impairment. (Tr. 253). Specifically,

2. A GAF score of 64 reflects some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *DSM-IV-TR*, at 34.

3. A GAF score of 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV-TR*, at 34.

Dr. Katz concluded S.T. was not limited in the domains of acquiring and using information, moving about or manipulating objects, and health and physical well-being; and had less than a marked limitation in the domains of attending and completing tasks, interacting and relating with others, and caring for herself. (Tr. 255-56). She cited a report indicating S.T.'s attention span was intact for her age; and Dr. Konieczny's findings that S.T. could concentrate, attend to tasks, and maintain persistence and pace at an age-appropriate level. (Tr. 255).

In May 2010, state agency physician Jennifer Swain, Psy.D., reached the same conclusions as Dr. Katz regarding S.T.'s level of functioning in the six domains. (Tr. 287-91).

**ALJ Hearing and Decision**

At the hearing, S.T. testified she was in second grade, liked to read, and received mostly A's and B's. (Tr. 38-39). She said other students picked on her because she was small and she talked back to her teachers sometimes, but her parents did not have to check up on her often at school. (Tr. 40-42). Plaintiff also testified and said she would take S.T.'s books away as a form of punishment when S.T. misbehaved. (Tr. 49). She also said S.T. was a lot calmer on medication. (Tr. 47-48).

Dr. Newman, the ME, testified and found S.T. had less than marked limitations with interpersonal relationships and attending and completing tasks. (Tr. 57-59). In making these findings, he reiterated S.T.'s school records, asked Plaintiff questions, and responded to questions from Plaintiff's attorney challenging his findings. (Tr. 58-59, 61-62). When counsel asked Dr. Newman whether fighting and other negative behavior at school evidenced a marked limitation in interacting and relating with others, Dr. Newman said "I think it's a function of age." (Tr. 61).

After the hearing, the ALJ rendered a decision and found S.T. was not disabled. (Tr.  14-31). He found S.T. had the severe impairments of ADHD and ODD, but they did not meet or medically equal a listed impairment. (Tr. 20-21). The ALJ further found S.T. had no limitations acquiring and using information, moving and manipulating objects, or with health and well-being; and less than marked limitations attending and completing tasks, interacting and relating to others, and caring for herself. (Tr. 22-31).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). In the case of a claimant under the age of 18, the Commissioner follows a three-step evaluation process – found at 20 C.F.R. § 416.924(a) – to determine if a claimant is disabled:

1. Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2. Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it is a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3. Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine, under step three of the analysis, whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). This approach, called the "whole child" approach, accounts for all the effects of a child's impairments singly and in combination. SSR 09-1P, 2009 WL 396031, at *2. If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. 20 C.F.R. § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i).

The six functionality domains are: (i) acquiring and using information, (ii) attending and completing tasks, (iii) interacting and relating with others, (iv) moving about and manipulating objects, (v) caring for yourself, and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

DISCUSSION

Plaintiff argues substantial evidence supports that two domains – attending and completing tasks and interacting with others – are at a marked level of impairment, and therefore, functionally equivalent to a listed impairment. (Doc. 14, at 10-15, 18). However, this argument is facially insufficient given the standard of review applied in judicial appeals of disability determinations. That is, even if substantial evidence supports a finding contrary to the ALJ's, this Court still cannot reverse so long as substantial evidence also supports the conclusion reached by the ALJ. *See Jones*, 336 F.3d at 477. Nevertheless, even construing Plaintiff's argument to be that the ALJ's findings in these two domains are unsupported by substantial evidence, it still fails for the reasons explained below.

Plaintiff also asserts the ALJ relied on invalid ME testimony; specifically, his findings that S.T. had less than marked impairments in the aforementioned domains. (Doc. 14, at 15-17).

### *Attending and Completing Tasks*

Plaintiff takes issue with the ALJ's conclusion about S.T.'s limitation in the domain of attending and completing tasks. (Doc. 14, at 10-13). The ALJ found S.T. had a less than marked limitation in this domain. (Tr. 24-25). In support of this finding, the ALJ cited ME testimony, school reports, teacher's notes, a consultive exam, Applewood progress notes, and S.T.'s and Plaintiff's testimony. (Tr. 24-25).

The domain of attending and completing tasks addresses how well the child is able to focus and maintain attention and begin, carry through, and finish activities, including the child's pace in performing such activities and the ease with which they change them. 20 C.F.R. § 416.926a(h). Based on her age during her application period, S.T. falls under two age descriptors in the regulations, preschooler and school-age child. §§ 416.926a(h)(2)(iii),(iv). The regulations describe this domain for S.T.'s age brackets as follows:

> (iii) Preschool children (age 3 to attainment of age 6). As a preschooler, you should be able to pay attention when you are spoken to directly, sustain attention to your play and learning activities, and concentrate on activities like putting puzzles together or completing art projects. You should also be able to focus long enough to do many more things by yourself, such as getting your clothes together and dressing yourself, feeding yourself, or putting away your toys. You should usually be able to wait your turn and to change your activity when a caregiver or teacher says it is time to do something else.

> (iv) School-age children (age 6 to attainment of age 12). When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation

§ 416.926a(h)(2).

The regulations also provide some common examples of limitations in this domain, such as being easily distracted, startled, or over reactive to sounds, sights, movements, or touch; being slow to focus on, or failing to complete, activities of interest (e.g., games or art projects); repeatedly becoming sidetracked from activities or frequently interrupting others; being easily frustrated and giving up on tasks, including ones the child is capable of completing; and

13

requiring extra supervision to keep the child engaged in an activity. § 416.926a(h)(3)(i)-(v). Whether these examples amount to a marked or extreme limitation depends on the totality of relevant information in the record. § 416.926a(h)(3).

Plaintiff cites *Matos v. Comm'r of Soc. Sec.*, 320 F. Supp. 2d 613, 614 (2009) and argues the ALJ failed to discuss whether he considered certain evidence which suggested S.T. has a marked impairment; and failed to articulate why he discounted certain evidence, such as accommodations in her IEP. (Tr. 24-25). *Matos* involved starkly contrasting opinions regarding the child's ability to maintain attention. 320 F. Supp. 2d at 615-16. For instance, his teachers reported "frequent" and "constant" focus, concentration, and attention problems, while state agency physicians found no impairments in concentration, persistence, or pace. *Matos*, 320 F. Supp. 2d at 616. The court in *Matos* took issue with the ALJ's failure to explain the contrasting opinions and his reliance on the child's extracurricular activities to discount his attention impairment. 320 F. Supp. 2d at 617.

First, unlike the child in *Matos*, the evidence here does not "support two very different portraits" of a child. 320 F. Supp. 2d at 615. Rather, the evidence clearly shows S.T. liked to read (Tr. 39-40), her grades were mostly A's and B's (Tr. 184-85), her behavior was "periodic and infrequent" (Tr. 196), and medication reasonably controlled her condition despite some hyperactivity in the afternoon (Tr. 47-48, 156, 165, 180, 241, 260, 261 262, 283-84, 293, 306-09, 310).

Second, while it is incumbent that an ALJ explain his decision and resolve contrary evidence, he is not required to discuss every piece of evidence in the record for his decision to stand. *Matos*, 320 F. Supp. 2d at 616; *but see M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 856-57 (E.D. Mich. 2012). Here, the ALJ appropriately discussed and compared several pieces

of evidence from the record to support his conclusion that S.T. had less than marked limitation in attending and completing tasks. (Tr. 24-25). For instance, he noted the ETR, which included teacher's comments that S.T. had difficulty handling "late arrivals and routine changes"; and Applewood progress notes showing S.T. had more problems maintaining attention as her medication wore off during the day. (Tr. 25). However, he accorded substantial weight to ME Dr. Newman's opinion that S.T. was less than marked in this domain and discussed Dr. Konieczny's opinion that S.T. did not demonstrate any limitations in her ability to concentrate or attend to tasks. He also took note of S.T.'s testimony that she enjoyed reading books; and Plaintiff's testimony that she had been working with S.T. on techniques to help her concentrate at school. (Tr. 25).

Plaintiff's argument that the ALJ failed to use the "whole child approach" articulated in SSR 09-1p is also not persuasive. (Doc. 14, at 13*); see Dodson ex. rel. S.L.S. v. Comm'r of Soc. Sec.*, 2012 WL 1831844 (S.D. Ohio) (ALJ failed to look at longitudinal view of child's functioning when he was significantly behind his peers academically despite special education and related services). At the outset, the ALJ outlined the appropriate standards and then provided a comparative discussion regarding the degree of S.T.'s limitation in this domain. (Tr. 25). In addition, the ALJ accounted for S.T.'s ability to "independently initiate, sustain, or complete activities" when he noted that she enjoyed reading books and took into account the ETR performed at S.T.'s school, which included the IEP. (Tr. 25); 20 C.F.R. §416.926(a)(2)(i). The IEP implemented coping and behavioral strategies and allowed S.T. extra time and frequent breaks during state-wide and district testing. Unlike the child in *Dodson*, S.T. was not "significantly behind [her] peers" despite minimal accommodations. 2012 WL 1831844, at *6. Rather, S.T. ranked fifth out of sixteen in her class, received all A's and B's, was not in special

education classes, and her teachers' noted only occasional outbursts. (Tr. 56, 184-85, 196). Even more, S.T. tested above grade level and received all A's and B's before the IEP was implemented, i.e., before she was given "accommodations." (Tr. 197-99). Moreover, as the ME pointed out, even when S.T. was punished for bad behavior, she turned to reading books. (Tr. 39, 49-50, 62)

Here, a review of the evidence shows substantial support for the ALJ's conclusion that there was some limitation in this domain, but not to a marked degree. That is, despite evidence from S.T.'s school showing some difficulty handling disruption with routine, S.T. responded appropriately to a flexible yet consistent schedule and an opportunity to be helpful in the classroom. (Tr. 188, 190, 196). Moreover, her teachers did "not see a significant degree of ongoing behavioral problems", noted only occasional outbursts which had lessened in intensity and frequency, and reported no concerns about her ability to understand lessons and directions and express what she knew. (Tr. 196, 201, 204). Indeed, while S.T. exhibited occasional inappropriate behavior, the ETR team determined it was not to a "marked degree" because the behavior was infrequent, short-lived, and non-severe. (Tr. 205, 207). Academically, S.T. received mostly A's and B's and tested in the average to high-average range for her age. (Tr. 197-99, 260, 310). Likewise, academic testing revealed S.T. was "working above grade level in almost every area" and "[n]o specific educational needs [were] noted[.]" (Tr. 199).

The medical evidence also supports the ALJ's conclusion that S.T. had less than a marked limitation in this domain. Despite some evidence showing S.T.'s medication wore off in the afternoon, it was otherwise effective (Tr. 260-61, 283-84, 293), and Plaintiff consistently reported S.T.'s medication improved her condition (Tr. 47-48, 156, 165, 180, 260, 294, 310). And while Plaintiff told Applewood S.T. had problems focusing and received all "D's", S.T.'s

school records show she received mostly A's and B's. (Tr. 228-29, *contra* Tr. 184-85). Moreover, Applewood progress notes consistently showed S.T. demonstrated clear logical thought process, intact attention span, average fund of knowledge, and appropriate abstract reasoning for her age. (Tr. 241, 260, 262, 283-84, 293, 306-10). In sum, Applewood treatment notes reflected S.T.'s medication was working but needed adjusting for sustenance throughout the entire day.

Further, consultive examiner Dr. Konieczny found S.T. responded to all questions and tasks posed; her ability to concentrate and attend to task were not impaired; and her persistence was age appropriate. (Tr. 249). Likewise, two state agency psychologists concluded S.T. had less than a marked limitation in attending and completing tasks. (Tr. 255, 288); *see* 20 C.F.R. § 416.927(e)(2)(i) (Non-examining state agency consultants are "highly qualified physicians and psychologists who are experts in Social Security disability evaluation.").

Last, Plaintiff and S.T.'s testimony support the ALJ's conclusion S.T. was not markedly limited in this domain. S.T.'s parents were admirably involved in S.T.'s education and instilled a strong penchant for reading in their household. (Tr. 49-51, 56, 63). Indeed, even S.T. testified she liked to read. (Tr. 39-40). To that end, Plaintiff said S.T. liked reading so much, she became "explosive" when her books were taken away as punishment. (Tr. 50, 62-63).

The totality of evidence in this case shows some limitation in the domain of attending and completing tasks, which the ALJ appropriately discussed. But the facts substantially support the ALJ's conclusion that her limitation is not so severe as to be marked. Accordingly, the ALJ's decision regarding this domain is supported by substantial evidence.

***Interacting with Others***

Likewise, Plaintiff argues the ALJ's decision that S.T. had less than a marked limitation interacting with others "lack[ed] a thorough review of the reports of [S.T.'s] teachers and counselor." (Doc. 14, at 13-15). To the contrary, the ALJ provided significant and substantial support for his finding in this domain. (Tr. 26-27). For instance, the ALJ cited ME testimony and findings, Plaintiff's testimony and disability reports, the ETR report, teacher's notes, Applewood progress notes, and S.T.'s testimony. (Tr. 24-25).

The domain of interacting with others addresses how well a child is able to initiate and sustain emotional connections with others, develop and use the language of their community, cooperate with others, comply with rules, respond to criticism, and respect and care for the possessions of others. 20 C.F.R. § 416.926a(i). The regulations describe this domain for S.T.'s age brackets as follows:

> (iii) Preschool children (age 3 to attainment of age 6). At this age, you should be able to socialize with children as well as adults. You should begin to prefer playmates your own age and start to develop friendships with children who are your age. You should be able to use words instead of actions to express yourself, and also be better able to share, show affection, and offer to help. You should be able to relate to caregivers with increasing independence, choose your own friends, and play cooperatively with other children, one-at-a-time or in a group, without continual adult supervision. You should be able to initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speaking clearly enough that both familiar and unfamiliar listeners can understand what you say most of the time.

> (iv) School-age children (age 6 to attainment of age 12). When you enter school, you should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)

Common examples of limitations in this domain include not reaching out to be picked up by a caregiver, having no close friends or friends who are all older or younger, avoiding or withdrawing from known people, anxiety or fear of meeting new people or trying new experiences, difficulty playing games or sports with rules, difficulty communicating with others (e.g. inability to use verbal or non-verbal skills to express oneself, carry on a conversation, or ask for assistance), and difficulty speaking intelligibly or with adequate fluency. § 416.926a(i)(3)(i)-(vi). Again, whether a limitation is marked or extreme depends on the totality of relevant information in the record. § 416.926a(i)(3).

As the ALJ found, there is some evidence of an impairment in this domain but not to a marked degree. Although S.T. had some trouble maintaining relationships and was withdrawn or sad at times, school reports indicated she could build satisfactory relationships at an age-appropriate level. (Tr. 205). In addition, the ALJ pointed to school records showing S.T.'s outbursts, while unpredictable, were periodic. (Tr. 26, *referring to* Tr. 196, 204-05, 207-08).

In addition, S.T.'s treating sources noted she was pleasant, polite, cooperative, and easily engaged. (Tr. 241, 260, 283, 293, 306-09). Moreover, while Dr. Konieczny found S.T. was somewhat subdued, she was cooperative, related well, and responded appropriately to all questions and tasks. (Tr. 26, 249-50). Further, while she fought with her sister and classmates at times, at other times they got along, and she and her sister were protective of each other. (Tr. 310). S.T. testified that she liked playing with her sister, but had six sisters and tended to get in fights with some of them. (Tr. 25, 38-39). She also got into fights with others when she was picked on because of her size; behavior which the ME pointed out was "a function of age." (Tr. 25, 61).

To that end, the ALJ accorded substantial weight to the ME, who characterized S.T.'s behavior as inappropriate but short-lasting and intermittent. (Tr. 26). The ME also concluded S.T.'s behavior did not negatively impact her grades and she could go months without significant behavior problems. (Tr. 26). In addition, the state agency psychologists concluded S.T. had less than a marked limitation interacting and relating to others. (Tr. 255, 288). Specifically, they noted while she had trouble with peers, she liked to play with other children. (Tr. 288). Accordingly, this evidence substantially supports the ALJ's decision.

Plaintiff points to Applewood treatment notes and the 2011 ETR to argue S.T. is markedly limited in this domain. The ETR indicated S.T. could build relationships at an age-appropriate level but had trouble maintaining them. (Tr. 205). Applewood treatment notes included parental reports of behavioral problems at school. (Tr. 306-310). However, these reports are diluted by school evidence describing S.T.'s behavior as periodic and non-severe, S.T.'s testimony that her parents did not have to check up on her often at school, cooperative behavior during examinations, excellent grades, and a reasonably effective medication regimen. (Tr. 40-42, 196, 204).

Regardless of the evidence cited by Plaintiff, which the Court does not find substantial, the Court cannot reverse so long as substantial evidence also supports the conclusion reached by the ALJ. *See Jones*, 336 F.3d at 477. As noted above, the ALJ's conclusion that S.T.'s limitation in this domain is less than marked is supported by substantial evidence. Therefore, Plaintiff's argument fails.

### *The ALJ Properly Relied on ME Testimony*

Dr. Newman testified S.T. had less than marked limitations in the aforementioned domains. (Tr. 58-62). After the ME gave his opinion about S.T.'s functioning, Plaintiff's counsel questioned him. (Tr. 62). Pertinent here, the following exchange took place:

> ATTY: …Doctor, I recognize what you were citing was from the IEP and it's their team assessment, but in the record there's also some pretty frequent reports coming out of Applewood about all the different issues at school. Let me just see, fighting at school, turning over her desk, refusing to cooperate, turning over her chair, her father getting called to the school frequently . . . . and fighting at school, particularly they said with two girls, and that they had to be separated and fighting with her sister, you don't think that the interacting and relating is moving into the marked area?
>
> ME: Again, I think it's, it's a function of age. I think when you've got two sixteen year old girls fighting over a boy and they're starting to pull hair and one pulls a knife on the other, yes, I think that's terrible. But what happens that this age, this is [inaudible] how you going to handle problems that you can't solve by talking, you're going to hit it out. And yes, it's bad, it's not good, but I can't look upon it as seriously as I will when she comes back the next time.
>
>                                   ***
>
> ATTY: ….And then in the attending and completing tasks area, they are giving her frequent breaks and…extended time. That's in that same report….
>
> ME: They are helping a good deal, that's great.
>
> ATTY: Yeah, it's –
>
> ME: In the final analysis, that help is, is proving to be useful, when she's coming up with all A's. She's a model student, she was student of the week. So yes, she has a problem, but is it interfering with academic pursuits. Even when she's naughty she turns to a book.

(Tr. 61-62).

Plaintiff argues this ME testimony demonstrated a "blatant disregard" for Social Security regulations. Specifically, because the ME considered how the child functioned with "significant accommodations" as opposed to how the child functions every day and in all settings compared to other children. (Doc. 14, at 15-16). First, S.T.'s accommodations cannot be considered

significant. The only accommodations S.T. received at school were extended time and frequent breaks during state-wide testing and rewards for good behavior. (Tr. 190-92). Second, evidence showed S.T. received all A's and B's and tested above her grade level before she received those accommodations. (Tr. 197-99). Importantly, the ETR evaluated S.T.'s behavior compared to other peers. For instance, the ETR reveled S.T. was testing above-average academically and her behavior was periodic, intermittent, and had a minimal effect on academics. (Tr. 184, 199, 204-07, 305). Accordingly, the ME did not blatantly disregard regulations by simply responding that accommodations helped when prompted.

Plaintiff also argues ME testimony failed to properly evaluate S.T.'s limitation in the domain of interacting with others according to SSR 09-5p when he responded that her aggressive behavior toward others was "a function of age." (Doc. 14, at 16). SSR 09-5p provides that preschool children should be able to use words instead of actions to express themselves, obey simple rules most of the time, and play cooperatively without adult supervision. 2009 WL 396026, at *6. Further, school age children should be able to develop lasting relationships, and learn to work in groups. *Id.* As explained above, S.T. is not without limitation is this domain. However, as the ME and ALJ noted, S.T.'s behavior was consistently described by school officials as periodic, not severe, occasional, and infrequent. Moreover, S.T. testified she liked to play with her sister and her parents were not called to intervene at school often. (Tr. 38, 42). An off the cuff response that six-to-eight-year old kids hitting each other was a "function of age" does not diminish the ME's findings.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Commissioner's decision denying benefits is affirmed.

IT IS SO ORDERED.

  s/James R. Knepp, II
United States Magistrate
